The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's case will be called as previously announced. The times will be as allotted to counsel. The case today is Penobscot Nation et al. v. Aaron M. Frey et al. Appeal No. 161424. Appeal No. 161435. Appeal No. 161474. And finally, Appeal No. 161482. Good morning. I'm Chief Judge Howard. We have an en banc court proceeding this morning. And Mr. Shaw, you may begin when you are ready. May it please the Court. The Beakshaw for the Penobscot Nation. Based on our agreement with the United States, I plan to take 14 minutes for the opening argument. Ms. Frey will then take 10 minutes for the United States. And with the Court's permission, I would like to reserve the remaining six minutes for rebuttal. Yes. Thank you, Your Honors. The settlement acts memorialized and ratified an agreement between the Penobscot Nation and the State of Maine to redress the Nation's expansive land claims arising out of prior unlawful treaty exactions. As understood by all parties at the time, the acts confirmed what was left of the Nation's aboriginal home moving forward. But now, 40 years later, the State attempts to renege on that agreement. The State makes a mockery of the Settlement Act's explicit confirmation of the Penobscot Nation's on-reservation fishing rights, rights rendered meaningless if the reservation excludes the main stem of the Nation's namesake river, undisputedly the only place on the reservation with water to fish. Ordinary principles of statutory construction foreclose that conclusion. Neither the State nor its intervenors offer any plausible, let alone unambiguous way, to reconcile the definition of the Nation's reservation with its on-reservation fishing rights unless the reservation includes the main stem. If any doubt remains, the Indian canons compel the Nation's construction, as the Supreme Court reaffirmed in McGirt just two months ago in response to a regrettable history of broken promises that the State seeks to perpetuate here. Your Honors, after three rounds of briefing, argument in the District Court, argument in the Court of Appeals, en banc proceedings here, the State and the intervenors still cannot agree on a coherent construction of the reservation in light of Section 62074's on-reservation fishing right. At the very least, that provision injects ambiguity and renders the scope of the reservation with respect to the main stem itself ambiguous. And if there is any ambiguity, then the Indian canons of construction must apply. Can I ask you about the canon point? Which is, the NIA, as I understand it, is a Maine enacted statute. Yes, correct. So, presumably Maine can decide, under Maine law, what interpretive rules govern it. Isn't that right? Well, Your Honor, the NIA is a Maine enactment, but it was ratified by Congress in Nixa. But in the federal statute that ratifies it. Yes, Your Honor. The federal statute just refers back to the definition in the NIA. So, I guess, suppose, what I'm heading towards, suppose I agreed with you that there's an ambiguity that arises in consequence of the 70, the 2074 reference to the fishing rights on reservation. If I thought that because I'm interpreting a Maine statute, the Indian canon would not necessarily apply to that Maine statute because it's Maine law. What am I supposed to do if I agree with you that there's an ambiguity? How do I resolve the ambiguity then? Sure, Your Honor. Well, let me first take a stab at the predicate, which is because Nixa ratified NIA, Nixa is clear. Nixa, and this was the agreement between the tribe, the state, and the United States. It set forth rules as to whose law should apply, Maine law versus federal law. And there are provisions in Nixa, the federal statute, that answer that question, 1725, 1735, and the baseline that Nixa itself says, and this is expressed, that federal Indian law principles shall generally govern the interpretation of the NIA. Is the canon of construction such a thing? Your Honor, yes. It is certainly an established principle of federal Indian law. Is there any case applying the federal Indian canon to a state statute? If there's not, you could get to the second half of my question. Yes, Your Honor. There are a number of them, including this court's own decision in Flenser. Flenser, at page 709, it lays out two principles that it says governs the interpretation of the Maine Settlement Act, and that was a provision of MIA governing the interpretation of that provision. And one of those two principles is that the Indian canons of construction apply. So this court itself has already determined that under the Maine Settlement Act, the federal Indian principles apply. And like I said, that follows from the regime that Maine itself agreed to. There are other courts that have also interpreted state settlement acts. The Connecticut Settlement Act, which is modeled on the Maine Settlement Act, the Second Circuit applied the treaty canon, the Indian treaty canon, in interpreting the Settlement Act there, even though, again, we have a state enactment that's ratified by Congress. The circuit in Rhode Island, the Narangansett, applying the Rhode Island Settlement Act, again, another state statute ratified by federal law, applied the Indian canon, saying we strictly construe any limitation on tribal jurisdiction. The NCI amicus brief lays out even more authority. Every settlement act case that we're aware of, we're not aware of anyone, and the other side has not cited one that does not apply the Indian canons of construction. That is federal law, Your Honor. Let me ask you a question different than – are you still answering this one? Yes, Your Honor. Your opponents claim that the Indians lost title to the Maine – assuming they had it – by adverse possession. What do you say to that? Sure. So a couple of responses there, Your Honor. First of all, there is a fundamental principle of Indian law, a canon of Indian law that says courts should not lightly presume when it comes to diminishing a reservation. There is no serious dispute here that the Penobscot Nation held aboriginal title at least to the Maine stem. The history is unequivalent of that. We don't hear the state and the state intervenors really disputing that they held aboriginal title, nor do we think there's any serious dispute that either the 1796 treaty or the 1818 treaty ceded that. Those treaties, the language is plain. It ceded the land on the sides of the river, not the Maine stem itself. So as you said, Judge Shorwaya, what the state's theory boils down to is this sort of adverse possession idea that at some point between 1818 and 1980 – I can't say when – but at some point between 1880 and 1980, the state somehow usurped control over and title to the Maine stem. But again, that Indian canon says Congress has to be explicit when you're talking about diminishing tribal sovereign authority or a reservation. The Supreme Court just two months ago in McGirt touched on this point as well. The other side doesn't even acknowledge McGirt, but McGirt at page 2462 takes on this similar argument about the state and there the state of Oklahoma made the argument, look, we've been controlling the city of Oklahoma, eastern Oklahoma for a long, long time, and so this land, we've essentially usurped it. And here's what the Supreme Court said in McGirt that, quote, a state could encroach on tribal boundaries and with enough time and patience nullify the promises made, end quote. And then Justice Gorsuch says we reject that sort of thinking. So, Your Honor, the adverse possession theory here runs afoul of the Indian canons, it runs afoul of Supreme Court precedent, and it cannot be reconciled with the state's prior positions if in fact it had believed it had clearly usurped the main stem through some unspecified acts over a century. Well, then you would not have had the state saying all the way up until 2012 that the main stem was part of the Penobscot Nation's reservation. In fact, the main Indian Tribal State Commission, which was set up by the Settlement Act in 1980 to be the expert commission half constituted by appointees from the state of Maine, half constituted by appointees from the tribe, and then they elect a 13th chair, they unanimously voted and submitted an amicus brief before this court and the en banc proceedings that says our expert view from the beginning has been that the main stem has been and continues to be part of the Penobscot reservation. If in fact the state had somehow adverse possessed unbeknownst to anyone the main stem of the river and contrary to its filings to FERC, contrary to its filings to the Department of Interior, contrary to its filings to this court up until 2012, all of which acknowledged that the main stem was part of the Penobscot Nation reservation, then we would have expected to see Congress to speak more clearly. It's inconceivable that Congress as trustee for the Penobscot Nation would have intended to give away the heart of the Penobscot Nation's remaining aboriginal homeland without being absolutely clear about it. And in fact, Your Honor, you don't need any of the Indian canons to resolve this case because simply looking at the Settlement Act as a whole, when you look at the definition of the Penobscot reservation, you have to read that alongside the statute's confirmation of the on-reservation fishing right that was specifically negotiated, highlighted by Congress as a central piece of the Settlement Act. If in fact the Penobscot Nation's reservation excludes the main stem, that provision has zero meaning. I'm sorry. What about the definition of transfer? Your Honor, yes, the statute does have a broad definition of transfer, but it is not unlimited. And again, when you're construing that definition of transfer and applying it to aboriginal reservation, again, the statute and the legislative history makes clear there is an existing reservation here. When you are diminishing an existing reservation, Congress has to be absolutely clear that it means to give away a part of that reservation. And so even if you construe transfer broadly, this statute is nowhere near clear enough to voice an indication that it meant to give away the main stem and take it outside of the reservation. And again, Your Honor, you don't even need the Indian canons to get there. You can do that based upon the statute itself. 62074, the neighboring provision to the definition of the reservation, says that the nation shall be able to exercise its sustenance fishing right within the boundaries of the reservation. Why is it not reasonable to conclude that the tribe has hunting and fishing rights on the main stem, even though it doesn't necessarily mean that it has to be part of their reservation? Well, Your Honor, because of section 62074 in the text of it, it doesn't say that the tribe has hunting and has sustenance fishing rights anywhere in Indian territory or elsewhere in the state of Maine. The text of section 62074, and I'll just read it to you here, it says notwithstanding any rule or regulation promulgated by the commission or any other law of the state, the members of the Passamaquoddy tribe and the Penobscot Nation may take fish within the boundaries of their respective Indian reservation. So the statute is explicit. That sustenance fishing right extends only within the boundaries of the reservation. And so I think that directly answers your question, Judge Thompson. That is the only place that this settlement act gives the nation the right to exercise its core sustenance fishing right. Again, this was of paramount importance to the nation, as Congress recognized, in the legislative history of pages 628 to 629 of the Joint Appendix. The only place it can exercise that is in the reservation, and it is undisputed that the only place in the reservation where you can fish is within the waters of the main stem. Again, you don't need any of the Indian canons. You simply apply the Supreme Court's tried-and-true method of ordinary construction, even outside of Indian law cases, that you have to read provisions of a statute so that the whole statute makes sense. Let me interrupt you there, counsel. Judge Selye is participating by telephone, and I just want to check with him to see if he has any questions at this time. No, thank you, Chief Judge Howard. I'm satisfied with the idea at this point. Anyone else on the panel wish to ask additional questions? All right, thank you. You've reserved some time, Mr. Shaw.  And if you would mute. Ms. Sprague, would you unmute? May it please the Court, Mary Gabrielle Sprague for the United States. This Court's 1975 decision in Joint Tribal Council of the Passamaquoddy Tribe v. Morton required the United States to step up and fulfill its duty as trustee to the Penobscot Nation and Passamaquoddy Tribe, and it led to federal recognition of those tribes and the negotiations that resulted in the Settlement Acts. The United States now joins the Penobscot Nation in asking this Court to adopt Judge Turoea's analysis of the Settlement Acts so as to preserve for the Penobscot Nation critical benefits of the bargain agreed to in the Settlement Acts. Judge Turoea correctly concluded that the Penobscot Nation, Maine, and Congress all intended to confirm to the Nation a reservation homeland that includes both the uplands and the surrounding submerged lands in the main stem of the Penobscot River. This is clear in Mixo Section 1723, where Congress retroactively approved the Nation's accessions in the 1796 and 1880 treaties of its aboriginal title to land on both sides of the Penobscot River, which thus confirmed as the Penobscot Reservation the historic reservation reserved from those areas between the sides of the river, minus any post-treaty transfers of specific parcels that might be established, such as the four townships that had been reserved by the Nation in 1818 but were subsequently sold to Maine in 1833. MIA Section 6202 expressly acknowledges that there was a present Penobscot Indian Reservation, and the intent to confirm the reservation is evident in the structure of Mixo as well, that there's a differentiation between the reservation and the territories. If there had been an intent to do away with the reservation, as the interveners argue, there would be no need to refer to a reservation separate from the territories. But Mixo only extinguished aboriginal title to the land that was ceded in the treaties, which is the uplands on both sides of the river, preserving to the Nation the river, because everyone knew that the Nation needed to preserve their right to fish and to hunt and trap in the waters of the Maine stem. That was a critical component of their substance. It's a critical component of their idea as Penobscot Indians. There was no doubt about that at the time of the treaties, and there was no doubt about that in 1980 when the Settlement Acts were enacted. Contrary to the state's assertions, the Nation and the United States are not trying to reopen the Penobscot's land claims. It's Maine that changed position in 2012 with the Maine Attorney General's opinion advising that the reservation includes no submerged land. And this court should reject Maine's efforts to renege. The course of conduct of the parties is very significant. The first clear pronouncement by Maine after the Settlement Acts was in 1988 when Maine Attorney General James Tierney issued a letter saying the Penobscot have the right to What's interesting about this is there is no limitation that they can only fish in part of the river, which was Maine's interpretation starting in the 90s. It was a general affirmation of their right to fish in the river. And this is significant because Attorney General Tierney wrote a Maine Attorney General opinion in 1980 which confirmed that the right to fish is consonant with property boundaries. Could you address how much of the river you understand to be within the reservation? Is it bank to bank throughout the whole stem, or is it less than that? Your Honor, we believe that it is bank to bank because the core definition of the reservation is what was not ceded in the treaties. Now, there might be some specific transfers, individual transactions that could possibly still be demonstrated, but this idea that there was any transfer by generic regulation, as Mr. Shaw argued, is just not consistent with federal law. If it is bank to bank, could you just address that along and adjacent language that's in the MIA and what it means? It seems to me that the words along and adjacent are redundant, so I'm just trying to figure out why there's the words along and adjacent and then how that bears on the need for that provision in light of the fact that you say the reservation goes bank to bank. Right. Your Honor, I'm not sure I can shed much light on the along and adjacent language. There's a lot of language that if you really get down to parsing, one could say that it could have been drafted more artfully. We believe that that particular language doesn't really resolve the question. On the one hand, you could say it would indicate that the waters, the submerged lands are not part of the reservation. On the other hand, as Judge Turwaya found in his opinion, which we believe to be a plausible interpretation, it could also allow for land to be brought into the reservation in compensation for land that was taken along the river to the south of the reservation, which ends, the south end is the head of the tide. It does raise a question, but it just creates an ambiguity. It doesn't, in our view, really weigh one way or the other strongly. With respect to that ambiguity, if we found that there was an ambiguity in the MIA, do you agree with the position of the Penobscot Nation that the Indian Cans apply to the construction of these provisions of the MIA itself? Yes, Your Honor. Maine, I believe, has conceded that federal law controls where there's any disagreement between Mixa and MIA. I believe that reading MIA… That's not my question. I'm assuming there's not a disagreement between Mixa and MIA. If I read Mixa simply to ratify whatever the definition of the reservation in MIA is, what is the authority that supports the idea that with respect to MIA's definition itself, a Maine court would be obligated to apply the Indian Canons in interpreting MIA? Do you follow that? I do, and I don't think I can add anything to what Mr. Shaw provided. I think he provided a comprehensive answer to that question, Your Honor. Counsel, with respect to how you're defining the reservation, you say it's based upon your understanding of the 1796 and 1880 treaties, that those treaties specifically reserve the Maine stem as part of the Indians' reservation. In saying that, are you depending upon the language of the treaty itself, or are you relying upon property common law as to what waterways traveled with land? Right. Your Honor, our common law argument is really a backup argument in response to the assertion that the reservation can only be the uplands. We think the controlling law is the treaty language. We do rely, as you know, heavily on Alaska Pacific fisheries, which it means that when you interpret a reservation that is silent on the inclusion or exclusion of submerged land, that you look to whether those submerged lands are necessary for the purpose of the reservation. But the common law is important because, at a very minimum, under Maine common law, an island parcel in a non-title reach of a river, like the Maine stem, is understood to presumptively include the submerged land to the thread of the surrounding channels. Now, that can be increased or decreased by the express intent of the parties. We believe that the treaty is a situation where the parties did express the intent that the submerged land would not just be limited to the thread, but would extend in the river bank to bank. So that's how the treaty— What specific treaty language are you referring to?  and the understanding that the purpose of the reservation for the Penobscot was largely to preserve their right to fish. And in order to preserve that right to fish in the Penobscot River, they needed to retain the riverbed in the reservation under principles of Massachusetts, at that time, common law, which then translated into Maine common law when it became a state in 1820, in addition to which the express provision in the 1818 treaty of a right of passage by non-members over the river, which again emphasizes that the river is within the reservation, but it's subject to the public's right of passage over the waters. And that is an understood common law public right imposed on riverbed that is privately owned. That also is consistent with the common law, but it was important to document that the public right of passage persisted. Council, just to clarify one thing. You've talked about bank to bank in reference to the islands. What about along the direction of the flow of the river? Is the entire submerged land from the entire river part of the reservation? How far does it reach from the islands that are specifically identified in the enactments? So it's very clear that the land south of Indian Island is not within the reservation. That has been clear for many, many years. That is the area. What is the precise boundary in your view? Your Honor, I would have to pull out a map, which I don't have just at the moment. I don't believe there's any dispute about that, but I'm afraid I can't. Nichols Rock, there was a place I think called Nichols Rock, but precisely where that is on a map, I'm not sure. So is it the south edge of the island? Your Honor, I'm afraid that I may not be correctly representing the Penobscot Nation's position here as to where that precise boundary is. Hopefully Mr. Shah can answer. Otherwise, we could provide the answer later. I'm sorry. All right. Judge Talia, any questions at this time? I have one. Counsel, as I understand your argument combined with Mr. Shah's, there are two main theories that you're asserting for this claim that the Penobscot Nation reservation includes the main stem. First, you argue that by ceding aboriginal title to the uplands, that that implicitly must mean that everything else remains within the reservation, including the main stem. Do I understand that argument correctly? Yes, Your Honor, although we of course acknowledge that any post-treaty transfers that are established were also aboriginal titles extinguished to them. Does that include adverse possession? Your Honor, I think that Mr. Shah was addressing the transfer theory as an adverse possession theory. Adverse possession indicates a more physical presence. I think that the theory of the state is more it's a transfer by regulation idea, that the Penobscots didn't fight hard enough against the state's failure to recognize its own sovereignty. So I think that the answer Mr. Shah gave covers the transfer theory as well. Could they have acquired title by adverse possession to the main stem between the time of the treaties and the time of the settlement? Your Honor, only we believe as to specific parcels of land, like the four townships that the nation sold to Maine in 1833, or a transaction in that nature. But this idea of transfer by just creeping regulation over the years, I think Mr. Shah demonstrated that idea has been rejected by the Supreme Court. That Congress needs to be clear when aboriginal title is extinguished, when reservations are diminished, when tribal sovereignty. This Court's decision in Bottomley in 1979 rejected the idea that the Maine tribe's sovereign immunity disappeared over the years because of a similar subjection to Maine authority. I apologize, I interrupted Judge Torellia. That's all right, Judge Torellia. I'm content. Other questions from the Court? Well, can I follow just on what I think was the thread that Judge Torellia was asking you about? Which is, what is the, and it's a version I think of what Judge Thompson was also asking, what are you relying for ultimately on the conclusion that the river was something that the tribe held title to? In other words, is it the 1818 Treaty? Is it history preceding the 1818 Treaty? Is it common law of Maine? What do we look to to be sure that the stem that we're now talking about was the Penobscot Nations to begin with in total, and then various parts of it were ceded along the way? Your Honor, it is the treaty interpreted as the Indians would have understood it. So it does require some appreciation of the history of the Penobscot Nation. But there can be no dispute that the Penobscot are a riverine people for whom the river was the critical component of both their sustenance and their cultural identity. So the United States, or the Supreme Court, has rejected the notion that a river is critical to the Crow tribe's identity, and holding that the bed of the Bighorn River was not intended to be reserved in that reservation. But there really can be no doubt, everyone understood this. It is well documented. So yes, one does have to understand who the Penobscot people are, but that is an easy understanding in this case. Thank you, Ms. Sprague. The clerk will call a recess. Thank you. The court is now in recess. The IT department will please confirm that the YouTube stream is paused. The next arguing person, Judge, is going to be Attorney Pett Warden. Yes, Ms. Pett Warden, if you would unmute your video and your mic, please. And you may begin your argument when you are ready. Good morning, Your Honors. Kimberly Pett Warden on behalf of the state of Maine and the named state officials. The state requests that the panel decision be affirmed. The Penobscot Indian Reservation does not include the bed, waters, or banks of the main stem of the Penobscot River. And there isn't any support for that position in the text of the Settlement Act. Congress, the state, and the tribes agreed upon that result. And not only are the water, bed, or banks are not used in the definition of Section 62038, but the surrounding terms of the Settlement Act show that this is not the intended result. When the Settlement Act talks about the tribes' right to fish on the Indian Reservation, if the main stem is the only place that that could have meaning, why would that be in the agreement? It specifically says, on the Indian Reservation. So, we don't think that the court needs to address the issue of sustenance fishing. Well, I do. So, please answer the question. So, the state is not concerned about the sustenance fishing that's occurring by tribal members in the main stem of the Penobscot River. I'm trying to figure out what that language means. I'm trying to figure out why isn't it implicit in that language, the recognition that fishing rights are occurring only on the tribes' reservation. The language of the statute does say within the boundaries of their respective reservations. But, you know, the court should be looking also not only at the sustenance fishing provision, but also in Section 62038 and the language that's utilized there, and in other parts of Section 6207, which divides the jurisdiction between the state and the tribe when it comes to fishing regulations. So, with respect to the sustenance fishing provision in Section 62074, you know, it could be that, you know, it's ambiguous or suspect to the boundaries of the reservation. So, are you interpreting ambiguity? No, again, because our position is, Your Honor, that the court really doesn't need to decide this issue. You know, it could be also that Section 62074 should mean something different than in Section 62038, as the majority suggested. And the preparatory language of Section 6203 of MIA allows for that result. But, again, there's really no need to reach this issue because there isn't a present dispute about where sustenance fishing is occurring. Counsel, if I can interject, Judge Thompson has asked a very significant question, and it does the State of Maine no good to try to avoid that question as a matter of statutory interpretation. As I have understood it, there are a variety of answers to the question. One is that the premise is wrong, that there could be, as of the understanding in 1980, that you needed the main stem of the river in order to fish. That's certainly the position that the interveners have taken. Another is that it has to do with the regulatory authority of the tribe, as opposed to the State of Maine. Another has to do with the fact that, in fact, this language goes to two different tribes. And as to the other tribe, it plainly served a function. I understand the argument that it is not a live dispute. The district court, contrary to the panel opinion, did think it was a live dispute. But the district court said the definition of reservation is not limited by the sustenance fishing rights, and that I'm going to say, yes, you do have those rights. It is an entirely separate issue whether the question is ripe or not. But whether it's ripe or not does not give the State of Maine the ability to avoid answering the question. So do you have any other answers other than the ones I have outlined? So, truthfully, Your Honors, if the Smith Foundation in the United States had not appealed to this court, then the State also would not have appealed in the district court decision, and that we would have accepted the district court's result that the sustenance fishing provision in Section 62074 means something different than in Section 62038. The State's primary concern throughout this litigation has been not about the sustenance activities of tribal members. But, Counselor, in engaging in statutory construction, we look to the entire act to see how phrases used in one part could help us understand how the same phrase used in another part should be interpreted. So it's not just a matter of whether the sustenance rights are before us. It's a matter of how we are to look at this legislation as a whole. The State agrees with that, Your Honor. Of course, you should evaluate these statutes as a whole. And there are other provisions within the Settlement Act that would indicate that the waters and bed of the Maine Stem are not part of the Penobscot River. I'm sorry to interrupt, Judge. I apologize, Chief Judge Howard. I wanted to double-check on the audio with the telephone call. I have a report that there may be an issue with the telephone call. Judge Selye, can you hear me? You're having trouble hearing? Could IT pause the stream for us for a minute while we resolve this? Thank you. IT, confirm this stream has restarted? Attorney Paduan, please go ahead. So I think where we left off is we were discussing the other provisions of the Settlement Act that use different language that would indicate that Congress and the parties intended to include the bed and waters of the Maine Stem within the Penobscot Indian Reservation. Notably, bed and waters are not included in the definition of Section 62038. There's also submerged lands in Section 62071, and that's not utilized in the definition of the reservation. Can I go back to 62074? You just need to give an answer to this question. If, to understand the definition of Penobscot reservation in the other provision of MEA, I thought it was important to see how the word reservation was elsewhere used in MEA, and that if I didn't know how it was used elsewhere in MEA, I couldn't figure out what it meant in 62074 because I thought that language itself wasn't so clear that it determined it. Then I have to figure out what 62074 meant when it referred to the reservation including allowing for sustenance fishing rights. So it would matter to me what Maine's position was as to what that provision means. And the two possibilities I can think of is 62074 does not include the river and yet still makes sense, or it does include the river, but the word reservation in it means something different than the way reservation is used elsewhere in MEA. Does Maine have a view as to which of those two things is true? So as I understand the question, is that 62074, one of the options is that it does not include the river, and that your other option you presented was that 62074, reservation, includes the river, but that reservation means something different than in section 62038. Does Maine have a view as between those two things for purposes of how I'm supposed to understand what the word reservation means in 62074 since I think it's important to figure that out to understand what reservation means elsewhere in MEA? So I think either of those could be the case. If pressed, I would probably pick the latter. You would pick the latter. Excuse me, Judge Barron, if I could just pursue that. The question is not either. The question is the position of the state of Maine. It could be both. It could be either. Does the state of Maine have a position? So in our brief, we have argued that one way to harmonize the two provisions would be to suggest that 62074, again, does not include the waters of the Maine stem, but again, would not preclude fishing from the islands of the Maine stem. But that's really only as a matter of statutory construction. There is no question that the tribal... What we're doing here is statutory construction. We're just trying to figure out what the state's position is. I would say it's both then. Both of those are either options. It could be one or the other, or it could be both. How do you meet that position with the finding of fact of the district court in this case, which is a finding of fact, and furthermore, it has not been appealed or questioned, quote, none of those islands contain a body of water in which fish live. How can you have that with a position that it does not include the stem under 62074? No, the state has never construed that a tribal member must face toward the island as opposed to the river if they were fishing from the islands. So you're saying that fishing from the shore meets what you're saying? Again, only in this statutory construction exercise. In reality, tribal members may fish for their sustenance from the waters of the stem in a canoe, in a boat, from the shore. They have always engaged in those practices, and the state has never interfered with those practices. So is the reason that there's this historical practice and acceptance of the practice, or is it implicit in the nation's ownership of the islands themselves that like the right to ingress and egress, they have the right to fish in boats? So in common law, there was a fishing right that attached to the owners of riparian land, but that common law right has been, extinguished isn't the correct word, but it's been now a matter of statutory construction, meaning that the state of Maine then enacted statutes that govern regulation, whereas the common law right of fishing doesn't control anymore. Doesn't the fishing by other people other than the Penobscot Nation interfere with their sustenance rights? No, we view the sustenance fishing rights as an individual right to take whatever fish is available within the waters of the river. So it's no guarantee. Hasn't the Penobscot Nation historically objected to the fact that the fishing by other persons were interfering with their sustenance fishing? Is there a record of that? Yes, in the 1820s, there are complaints by the Penobscot Nation with respect to fishing practices by non-tribal members. But again, I want to get back to the transfer argument, because the way that the Penobscot Nation and the United States have described the transfer provision... Before you go to the transfer argument, just so I'm clear, if I thought that it was not likely or plausible that in reserving the sustenance fishing rights, the parties to that provision did not imagine fishing from the river, that the only fishing that could occur would be standing on the island beyond the high-water mark. If I thought, therefore, that that sustenance fishing provision contemplated the reservation included the river, what is Maine's explanation of how the reservation could be used to include the river in 6207.4 but not include it in the other provision in MIA that defines the reservation? In section 6203, yes. So I think that the court could utilize the prefatory language of section 6203 that says that except as otherwise provided, or unless the context indicates otherwise, the following terms will have the following meanings within the Settlement Act. If it indicates otherwise, is the idea there that 6203.8 is just so clear that the context would have to indicate otherwise? Because if the context were... if 6203.8 were not itself clear, I don't see why the context would indicate otherwise. Yes, if the court concluded that 6203.8 wasn't clear, you know, with respect to the sustenance fishing right, then yes, I think the context could indicate otherwise in section... that prefatory language of 6203, as the majority suggested, could assist the court in interpreting the on-reservation sustenance fishing right in section 6207.4. But, you know, again, 6203.8, you know, as we've argued in our brief, we don't think that it is ambiguous with respect to where the boundaries of the reservation are, particularly that it doesn't include the bed or the waters of the main stem. And I think the court should also read into that definition or will have to be aware of the transfer provisions. So the transfer definition is broader than the United States and the nation have argued to this court. They've only really focused on the first half of the definition of transfer, which identifies typical property transactions. But the second half of the transfer definition, which the U.S. and the Penobscot Nation ignore, states that a transfer is also any act, event, or circumstance that results in a change entitled to possession of, dominion over, or control of land or other natural resources. You claim it includes adverse possession. Am I correct? Yes, it would include adverse possession. But I agree with the United States that adverse possession is really more about possession of land for a specific period of time. Transfer is defined more broadly than that. At what point and by what device between the treaties and the Settlement Act did the state of Maine acquire the title to the main stem and the land underneath? So Massachusetts, as one of the original 13 states, held title to all the navigable waters and the land underneath by virtue of their statehood. When Maine entered the Union in 1820, they succeeded to whatever rights Massachusetts had. So the state's not seeking to undo any prior property transactions. All of those transactions were confirmed. But because of historical practice, the states conveyed the bed of the Penobscot River to private party. Excuse me, can I interrupt you right now? Yes. Because I would like to know why they would have the provision that Massachusetts put in the treaty that if Massachusetts had title to the river, is what you're saying, why would they need the provision in the Treaty of 1820 allowing Massachusetts residents or Massachusetts citizens free travel to transport lumber over the river? And notice it was limited to lumber transportation or similar items. Did it say anything about hunting or fishing? No, there's no reference for hunting or fishing in any of the treaties between the states and the tribes. Although there is a reference to some islands in one of the treaties where the tribes have exercised this. I diverted the question a little bit. Specifically, why do they need a provision in the treaty saying that Massachusetts citizens can travel over the river if Massachusetts owned the river at that point? So I think that in the Treaty of 1818, also there was a reference to the four reserved townships. And so that is the way that we've referred to that reservation for the tribes is to ensure that citizens would have the right to pass and repass amongst those. But history also shows that the state of Massachusetts and Maine just simply presumed that they had title to the bed of the Penobscot River. And then they subsequently engaged in a series of land transactions in which they conveyed land on both sides of the Penobscot River and including language that would have included the bed of the Penobscot River. Those are the exact same transactions that were approved by Congress in Section 1723. But the treaty speaks about the Penobscot River. It doesn't speak about the Penobscot River in front of those four townships, does it? The 1818 does reference the four reserved townships. But with respect to the transfer position argument, rightly or wrongly, Massachusetts and Maine did engage in these conveyances. They did convey land that included title to the bed of the Penobscot River. And all of those transfers were confirmed. Excuse me. Chief Judge Howard, I'm sorry. We're having the same issue again with the telephone link? Yes. Well, let's go on pause then until we resolve it. IT, can you confirm that pause? Thank you. If the IT could confirm that we have the stream running? Okay. Thank you. Attorney Paduaren, I believe the judge said you'd have five minutes remaining. Counsel, I misspoke when I quoted the treaty. It reads that the citizens of said commonwealth shall have the right to pass and repass any of the rivers which run through any of the lands hereby reserved. That's how it reads. Yeah. Why would you need that if you own the river? So I think there's two answers. One, these were drafted by lawyers, and so lawyers like to have a backup argument. But again, it's also with those reserved townships that were on both sides of the river. But from the state's perspective, the treaties are a historical fact. The 1980 acts were a new relationship. They defined a new relationship between the state and the tribes going forward, and with the federal government as well. You don't have to go... Don't the acts require us to go back and read and take those treaties into consideration? No, the treaties are referenced in the definition of 62038, but they are not incorporated into the settlement act. And in fact, section 1731 releases the state of all of its obligations under any treaty that's in the federal act. So no, the state does not have any obligations under the treaties of 1796 or 1818. All of the rights and obligations of the state and all of the rights and obligations of the tribe are as found in the settlement act. 62038 says the Penobscot Reservation means the islands in the Penobscot River reserved to the Penobscot Nation by agreement with Massachusetts and Maine. And 1723A1 ratifies any transfer pursuant to any treaty. So I don't see how you can avoid going back to those treaties to see what we're talking about. Well, those treaties are broader than what's actually found in the settlement act right now. So if they were trying to ratify the exact... I'm sorry, excuse me. I'm sorry, Chief Judge Howard. Judge Selye is still having trouble hearing you. Can you hear us, Judge Selye? Judge Selye? Apparently he's been still having breakup issues, Judge. Yes, all right. We're going to pause one more time. IT, could you pause for us? Before you begin, IT, can you start the stream for us? Thank you. Sorry, Judge. Two and a half minutes. So with, again, the transfer provisions, any interpretation of section 62038 and 62074 should also include the transfer provisions because it's not just, you know, a regular property transaction. It's also any exercise or any act, any involuntary or voluntary act that affected a change in dominion or control or title to land or natural resources. So all of the transactions that the state of Maine and the state of Massachusetts engaged in after acquiring the land and the treaties, all of those were transfers. And all of those transfers were confirmed by section 1723 of the Federal Settlement Act. And that also extinguished the tribe's aboriginal title as to those transfers. So, again, the question isn't whether or not the state had title to the bed of the Knoxvac River when they made those transfers. They acted as if they did, and all of those transfers were confirmed. One thing I'm confused by by that part of the argument, that seems to presuppose that the river was part of the reservation prior to that transfer. Now, earlier when you were arguing to Judge Terwaya, you said that the river was not part of it even at the time of the 1818 treaty or thereafter. I'm just trying to figure out what the state's actual account is of what happened. And I find it not very helpful to just keep all these balls in the air that, well, maybe it's this and maybe it's that. What is the account of what the party's understandings were when they came to MIA? Because the whole point of MIA was to settle what the understanding was. It seems to me hard to get a grip on that unless there's some coherent account of what the party's understandings were going into that settlement agreement. So, it's undisputed that leading into the settlement act that the tribe had not exercised sovereign control over the Penobscot River for many, many years. Okay, that's fine. Is it also, was it their understanding that they never had sovereign control over it? No, I would not say that would be the state's position because that would not... Okay, so when did the state and the states do, when did the tribe last have sovereign control over it? You know, I can't say, Your Honor. It's not in the record but it would be before, you know, before settlers from Massachusetts and Maine, from the colonies arrived. They did not exercise dominion and control over these resources. It's that, over time, they lost dominion and control over those resources. Did they lose their control in the 1818... In Maine's view, did they lose sovereign control prior to the 1818 treaty or afterwards? So, they would have every single act of conveyance that Massachusetts and Maine made after the 1796 and 1818 treaties was an act of conveyance or control over land and resources. Does that mean Maine's view is that they did have sovereign control after 1818 and then thereafter gave up more and more of it or is the view that prior to 1818 they did not have sovereign control or that they gave it up in 1818? Which of those is Maine's view? So, I think Maine's view is that it doesn't necessarily matter for purposes of interpreting the transfer provision. Let me tell you why, to me, that's true. I could see why maybe it doesn't for the transfer provision. Although, you would want to know what the baseline was so you could read the significance of the actions that occurred thereafter to see whether it really met the standard of effecting an implicit transfer. But, as I read the 1818 treaty, some of the language and it looks a lot like the language in India, the reference to all the islands, etc. So, it would seem to be relevant whether Maine's understanding was that 1818 treaty contemplated the river being part of what the tribe had control over. Does Maine have a view of that? I don't think there's anything in the record that specifically speaks to that and I would be hesitant to go outside of what the summary judgment record says in this particular case. But, you know, it kind of goes back to what the... Does that mean in Maine's view it was unclear whether the tribe had the river at that point? I think that these are arguments and issues that would have been litigated in United States v. Maine that led up to the Settlement Act. You know, what were the party's intentions in 1796 and 1818? Were those transactions in violation of the Trade and Intercourse Act? The state maintained that they were not, that the Trade and Intercourse Act did not apply to the state and that these transactions were not unlawful. And that never reached a resolution where there was a decision from a court that said that those transactions were unlawful. So, I'm not trying to not state a position. I'm just saying that these are issues that were never addressed through that litigation and these were issues that the Settlement Act were designed to resolve so that whatever the resolution was designed. The problem we're having is that because MEA itself references the 1818 Treaty, we're trying to figure out what the baseline is for ownership of the river at that point. Now, Isabel, your position is that I guess is that the transfer provision makes that an irrelevant question. Is that your position? Well, the upland owners in 1980, many of them held title to the bed of the Penobscot River. There were numerous dams that spread across the Penobscot River at that time. And in order to build those dams, they had to show that they had title to the bed of the Penobscot River. So, in 1980, there were numerous landowners that had title claims to these areas. All of those claims were resolved through the 1980 Act. So, the position of the state is that in 1980, because of those land transactions, that the tribe would not have had title to the bed of the Penobscot River. And that's consistent with the historical practice. And the transfer provision, again, was meant to confirm the existing situation on the ground. So, the United States and the Penobscot Nation have said that the Settlement Acts are intended to confirm what that which was not was ceded in the Acts. But they rely on the Senate report for that argument. But the Senate report also says, and not subsequently transferred. So, again, the transfer provision is a term of art within the Settlement Acts. And Congress intended to uncloud the title of all of the land claims, all of the property owners whose title has been called into question through the 1980 or through the land claims case that was litigated in the 1970s. You know, they did not exempt a group of landowners that were going to have to prove their title later on as the United States suggests in its reply brief through a quiet title action in order to show that its title was good. That is exactly the result that the 1980 Acts were designed to avoid. Other questions from the Court? Thank you, Counsel. We'll hear from Mr. Dunlap. May I please record, Joshua Dunlap on behalf of the State Intervenors. I believe it might be most helpful for the Court if I picked up on the line of questions that were left off, which is whether or not the text of the Act incorporates the treaty. And the answer is no. And it's only necessary to compare 62038 with sub 5, which defines a Passamaquoddy reservation to see what purpose the reference to the prior treaty had. The Passamaquoddy reservation is defined as lands reserved to the Passamaquoddy by agreement, which is then expressly quote, limited to specific areas. And there's a lengthy delineation including Indian Township, Pine Island, etc. Then when you look at sub 8, the text of the issue here,  the Penobscot reservation is defined as islands in the Penobscot River reserved by agreement, quote, consisting solely of specific areas, Indian Island and all islands in that river northward thereof. So in both instances, what is the 1818 treaties language? The 1818 treaties language is similar to that. I know it's not identical, but in the relevant respect, I had understood that it was similar in the sense that it's referring to islands, a collection of them. So just repeating those languages in the media raises the question for me, well, if similar language referring to a collection of islands could have included waters then, why couldn't it include waters now? Just as a matter of statutory interpretation of MIA. Our position, Your Honor, is that the prior treaties are irrelevant at this point because of the operation of the acts and the broad transfer provision. As a formal legal matter, that's right, but I'm saying there's words in MIA that look like words in the 1818 treaty. So we're arguing if yes. And the relevant ones is that they refer to a collection of islands without saying whether it means land than water or just which of the two, land, water, both. Right? And that's true in MIA and it's true in the 1818 treaty. So it seems to me that if the understanding was that in the 1818 treaty, that form of words included the river, there would at least be a question whether by using those similar words in MIA, it also might include the river. What's the answer to that? There are similarities, but they are not the same. They're not coordinate. And so you have to really look at the acts instead of the treaties to determine what the boundaries are. Do you have a view as to whether the 1818 treaty's words included the river or not? Our view is that the treaties aren't as relevant at this point. I know that. I know that, but I appreciate how relevant they are. I'm just asking whether despite their irrelevancy, you have a view as to whether the 1818 treaty included the river. Our position is that by 1818, the river was no longer within the reservation. Okay. And what would I look to to support that conclusion? Well, there would have been a fight over this issue obviously if the litigation had continued forward. Although, why not the exercise of control and dominion would have been sufficient at that point. Our position is that it was. But, I think the benefit for this court is that the source of it was not the treaty language itself that took away the river. It would have been actions that predated the formal use of the words by Massachusetts. Is that the idea? Yes. The exercise of control over time extinguished title. And there would have been a fight over whether or not that was sufficient. But, now what we have is the benefit of the act is to express the status quo. Does that mean that they used the words that they used in the 1818 treaty that the Penobscot Nation might not have understood those words to exclude the river? You would concede that, right? There would be a competing fight between the Indian Canyon and the Navigable Waters Canyon and how that would interplay with the treaty. What about the non-intercourse act? Would that have anything to do with whether they lost it or not? Are you talking about the Selma Act? I'm talking about the non-intercourse act. Wouldn't that impede any transfer of land that you are referring to? There would have been a fight over that, Your Honor. Absolutely. Our position is... Let's wrap up the question for me. And I appreciate how you're... It's very helpful the way you're answering these so I get a sense of what the baseline is. If I thought that from this back and forth it made sense to conclude that the tribe would not have thought that the language of the 1818 treaty conclusively resolved that the river was no longer part of the Penobscot Nation's reservation or part of its sovereign control. And then I looked at me and I saw the words that they used in Mia mirroring in many respects the words from the 1818 treaty. It seems to me there would be a good argument that the Penobscot Nation in... when Mia was adopted also would have had that same understanding that the river belonged to it though Maine might have had the opposite understanding. And so the very ambiguity that existed in 1818 seems to have carried over to Mia. What's the reason to think that's wrong? The reason it doesn't carry over is because of the transfer provisions. And because there it expressly says that the exercise of dominion over control over... But then those provisions don't distinguish whether that was actually contemplated. It just says it could have occurred. It doesn't tell you whether there was a transfer. It just says a transfer could occur through those means. Well, and it made sure to expressly state that it could occur through those means and not simply transfers. Because in the transfer provision it refers to including but not limited to by treaty. And so I'm planning to contemplate that the transfers was much broader than treaties and extinguished all Indian title based on exercise of control. If it's helpful to the court also I would turn to section 62074 and the issues that were being raised by the court on that point. I would suggest that as has been noted 62074 applies to multiple tribes and so it is not necessary to construe that provision broadly in order to make it meaningful. And you can ask the nation. The nation... What's the argument for construing it in such a fashion that it doesn't refer to the phenapscots? Well, they can... It does apply to them so far as they can fish from the islands, from the islands upward. And one might say, well, that is a narrow... That's a narrow way. True enough. But that is not the only aspect that the nation benefits from. They benefited from financial payment. They benefited from recognition of sovereignty over their internal matters. And federal recognition as a tribe. And so all those taken together, there was consideration for the nation, even though the past might have... We're to assume then that a riverine tribe negotiated away its sustenance rights in that fashion? What's important is to look at the text of the act and then the text of the act. And the text of the act is a document that states that the document states that the document states that it states that it states that it states that it states that it states that it states that it states that the act is an act that the state  nature does not modify islands. It does not modify islands. The word islands precedes the word solely. So we know what it consists of. It doesn't tell you whether islands means water and land or both. It doesn't speak to that question. I would disagree with that. The word islands does follow. It does occur in both places. I believe solely excludes anything other than islands. That is  by words such as in and the operation of for instance 6205 3A. It's a holistic look that supports the notion of islands. Can I suggest another way of interpreting that? Between 1820 and the time that this language was put into the settlement act, isn't it correct that the Penobscot River had changes in the number of islands that were caused by the flow of the river and that this language was put in there to exclude those islands that were created by the change of the river? That's why it says solely the islands that existed in the 1820 time. Are the same ones that are put in this as Judge Barrett has indicated? I would suggest that the definition is modified to give the nation more land as a result of lands lost by flowage. If submerged lands were truly part of the act, lands lost would not matter. Land above or below the river would be the same for the reservation. However, because those uplands that were lost, there were additional lands granted to the nation. That's an important point. All the islands mentioned in the 1820 treaties existed when the settlement act was enacted. The same islands were named. Is there any doubt about that? We're not  If you're referring by putting solely, it meant solely those islands, not any other ones created by the river in between. I would  that, your honor, for the reasons I stated. I believe that solely is plainly delineating the bounds and the bounds are the island and the islands are uplands. That's a portion of the decision not cited by the United States. It said something different in Alaska Pacific, didn't it? What islands meant. What's important there is there was different language. It was body of land known as the islands. Which is a phrase that's very different than island. Body of lands can be referred to as geographic area. Broadly construed. And so they looked into whether or not that included submerged land. When there's not an ambiguous term, you don't look beyond the plain language. The Supreme Court said that the islands could not sustain themselves from the use of  alone. The use of the adjacent fishing grounds was equally essential. The Indians naturally looked on the fishing grounds to see themselves as part of the islands. It seems to me that's exactly what's happened here. I've had nothing but ambiguities here this morning. We would respectfully disagree with that. Other questions from the court? Thank you, Mr. Dunlap. And we will hear from Mr. Shaw again. Thank you, your honors. It is nothing short of stunning to the Penobscot nation that the state still refuses to give a coherent account of either the relevant provisions of the statute or the key history underlying those statutes. Let me just recap to start with the statutory question. The state still is ignoring 62074, which is the other place in the statute that uses the term reservation. We can cite scores of Supreme Court precedent that says you have to harmonize statutory provisions that use the same term. I think it's not surprising that the state hasn't offered a competing construction because there is an easy construction that reconciles both provisions staring us in the face. That construction is that the Penobscot nation's reservation encompasses the main stem of the Penobscot river. That construction reconciles the text. It reconciles the history. You never get to that issue if, as your opponents contend, the text of 62038 is just clear in excluding waters because then if that was so clear, 62074 would have to be read in light of the in-context language. What is your answer to 62038 not being clear? A couple of responses. You don't just read a single provision. I don't want to talk about that issue. I will talk about 62038 and why in and of itself, why in and of itself it is not clearly and unambiguously excluding waters. It uses the term island and references the islands in the 1796 and 1818 treaties. At a minimum, that injects ambiguity because the Penobscot nation has always understood those treaties. They have not cited a single thing that conflicts with that understanding. We have mountains of evidence in the record that shows the nation and everyone has understood those treaties to leave the main stem of the river with the Penobscot nation. That alone injects ambiguity. The second point I would make is that Congress wrote that statute and I don't want to get into a big deal about Alaska Pacific fisheries but it wrote that statute against the backdrop of Alaska Pacific fisheries and there it did not just stop at the plain text of island. It said we are going to look at that island. It is only meaningful to the Indian tribe if it includes the surrounding waters they found so valuable. Even if you shut your eyes to the rest of the statute, 62038 favors us. You have to look at the rest of the statute. 62074 kills any ambiguity because the state can give any coherent construction to 62074 that reconciles the term unless you assume the nation negotiated a provision that had no meaning and unless you assume the United States as its trustee ratified a provision that had no meaning. That is not how we should be construing statutes with respect to anyone let alone Indian tribe. The only two constructions just to not give short shrift to it even though the state refuses to articulate what you did, there are two possibilities. One is that provision still had some place to fish. The record squarely refutes that. We have multiple sites. It is not disputed there is no place on the reservation to fish but for the main stem. There is no other water on the reservation. That leaves them with the interpretation that not even the state advances but the state intervenors say maybe they can stand on the shore and cast a line. Of course you have to look at history. The nation fishes on boats. That is why the state recognized that until 2012. Exactly that practice. They have no coherent explanation. The only other meaning is that reservation means two different things even though it is in the same statute. Congress has to be crystal clear if it wants to define the same term. That is the statute. We win the case on that ground. If you want to go further, the history. Again, this is summary judgment. We look at the evidence. This is undisputed. The aboriginal homeland encompassed the river. They have lands on both sides of the river. In 1796 and 1818 treaties printed in the addendum to our brief, they are short. They transfer to the state of Massachusetts land on both sides of the river. If there is any doubt about that, in 1818, they specifically grant Massachusetts the right of passage in the river. If there is still any doubt about it, there shouldn't be. Of course you have to construe treaties as the Indian tribe would have construed them. All they can latch on to is this regulatory transfer idea. There is no doubt that the statute doesn't recognize it. That leaves one question. Does the reservation include bank-to-bank or some other line? That is an even more straightforward question. The district court said the sustenance fishing right, the tribe has always used the bank-to-bank and that is why it recognized for 62074 that the reservation is bank-to-bank. That comports with the history. Again, I can give you all the links to the JA. It starts at the south at Indian Island. It goes north for the purposes of this case. The counterclaim is about the main stem. The main stem ends at the east and west   river. It doesn't make sense to create artificial lines in the river. It can't be that if their boat moves a foot to the left that you can't enforce the statute. That's never how it worked before 1980. The third argument although I don't think you even need to remotely get there because they don't have any good argument to limit it not to bank to bank but if there's any doubt about it then the Indian cannons kick in. If there's questions about the scope of an Indian reservation, the doubts are resolved in favor of the Indian tribe. Thank you. Thank you all. We will  case under advisement and get a decision to you as soon as we can. Thank you, your honor. That concludes arguments for today. This session of the honorable United States Court of Appeals is now recessed. God save the United States of America and this honorable court. Counsel, you may now disconnect from the meeting and IT may stop the YouTube stream.